2020 IL App (1st) 191175

SIXTH DIVISION
July 24, 2020

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

No. 1-19-1175

MARKEL INTERNATIONAL INSURANCE
COMPANY LIMITED,

    Plaintiff-Appellee/Cross-Appellant,

v.

AMBER MONTGOMERY, as Special Administrator for
the Estate of Kyle C. Matthews, Deceased; TREMEICE
DANGERFIELD; VALELL CORPORATION, an Illinois
Corporation, d/b/a Carolyn's Lounge; and CAROLYN
BURTON, Individually and as President of the Valell
Corporation,

    Defendants-Appellants/Cross-Appellees.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Appeal from the
Circuit Court of
Cook County,

No. 2017 CH 13342

Honorable
Pamela McLean Meyerson,
Judge Presiding.

PRESIDING JUSTICE MIKVA delivered the judgment of the court, with opinion.
Justices Cunningham and Harris concurred in the judgment and opinion.

**OPINION**

¶ 1    Plaintiff Markel International Insurance Company Limited (Markel) sought a declaration

in the circuit court that it did not owe a duty to defend its insured, Valell Corporation d/b/a

Carolyn's Lounge (Carolyn's), a nightclub in Chicago, for an incident that occurred in the

Carolyn's parking lot that resulted in the death of Kyle Matthews and the injury of Tremeice

Dangerfield. Ms. Dangerfield, Amber Montgomery, as administrator for the estate of Mr.

Matthews, Carolyn's, and its owner Carolyn Burton (collectively, defendants) filed a counterclaim arguing that (1) Markel breached its duty to defend Carolyn's in the underlying lawsuit, (2) Markel breached its duty to indemnify Carolyn's, (3) Markel was estopped from asserting defenses to coverage for the default judgment, and (4) Markel's denial of coverage was vexatious and unreasonable. Both parties moved for summary judgment; the circuit court denied Markel's motion and granted defendants' motion. The circuit court also determined that Markel's indemnity obligation was limited to the policy's $1 million limit per occurrence and that the incident qualified as one occurrence.

¶ 2    Both parties appealed. Defendants argue that the circuit court erred in limiting Markel's indemnity obligation to $1 million. Markel argues that (1) it had no duty to defend the underlying lawsuit, (2) it was not estopped from denying coverage for the default judgment, (3) denial of the coverage was not vexatious and unreasonable, and, in the alternative, (4) the circuit court was correct to cap its obligation at $1 million. For the following reasons, we reverse the judgment of the circuit court as to Markel's duty to defend, which also resolves the other issues in this case.

¶ 3                                    I. BACKGROUND

¶ 4                                    A. The Incident

¶ 5    The underlying complaint was filed on October 28, 2013, by Ms. Dangerfield and Ms. Montgomery, against Carolyn's and its owner, Carolyn Burton; Leonard Lee, a Carolyn's security guard; and Arthur Bettis and Maurice Jones, the two alleged assailants. Detailed below are the allegations taken from the complaint in that action.

¶ 6    On October 30, 2011, Mr. Matthews and Ms. Dangerfield were leaving Carolyn's when they were confronted by Mr. Bettis and Mr. Jones—two men who were returning to Carolyn's with handguns after being removed from the premises. In order to keep the two men from entering

the nightclub, Mr. Lee secured the door, leaving Mr. Matthews and Ms. Dangerfield in the parking lot with the men. According to the underlying complaint, "[Mr.] Bettis and [Mr.] Jones assaulted and battered [Ms.] Dangerfield in the presence of security." When Mr. Matthews attempted to protect Ms. Dangerfield, Mr. Bettis shot and killed him. This incident is again described later in the complaint, where it is alleged that "[Mr.] Bettis, without any cause or provocation and with intent to do bodily harm to [Ms.] Dangerfield, did severely harm, assault, and batter [Ms.] Dangerfield by striking her in the face" and "without any cause or provocation and with intent to do bodily harm to [Mr.] Matthews, did severely harm, assault, and batter [Mr.] Matthews, by striking him in the face and body and fatally shooting him." Finally, the complaint alleged, "[a]s a direct and proximate result of the intentional acts of [Mr.] Bettis, [Ms.] Dangerfield suffered severe and permanent physical and emotional injuries and [Mr.] Matthews[ ] suffered and died from a fatal gunshot wound."

¶ 7    The underlying complaint alleged that Carolyn's, Ms. Burton, and Mr. Lee were all negligent. The complaint also alleged a wrongful death claim and a Survival Act claim against Carolyn's on behalf of Mr. Matthews's estate. Finally, the complaint alleged claims of assault and battery, intentional infliction of emotional distress, wrongful death, and a claim under the Survival Act against Mr. Bettis, as well as assault and battery and intentional infliction of emotional distress claims against Mr. Jones.

¶ 8                                    B. The Policy

¶ 9    Carolyn's general commercial liability insurance—supplied by Markel—for the policy period of February 18, 2011, to February 18, 2012, included among its coverages "bodily injury." The policy detailed:

    "We will pay those sums that the insured becomes legally obligated to pay as damages

because of 'bodily injury' or 'property damage' to which this insurance applies. We will have the right and duty to defend the insured against any 'suit' seeking those damages. However, we will have no duty to defend the insured against any 'suit' seeking damages for 'bodily injury' or 'property damage' to which this insurance does not apply."

¶ 10    "Bodily injury" was defined by the policy as "bodily injury, sickness or disease sustained by a person including death resulting from any of these at any time." The policy detailed that the insurance applied to bodily injury if "[t]he 'bodily injury' *** [was] caused by an 'occurrence' " and fell within the policy period. The policy defined "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." The policy limited the insurance for each occurrence to $1 million. In addition, the policy included an endorsement titled "Exclusion—Assault and Battery" and an endorsement titled "Exclusion—Firearms."

¶ 11    The assault and battery exclusion stated:

"The coverage under this policy does not apply to any claim, suit, cost or expense arising out of assault and/or battery, or out of any act or omission in connection with the prevention or suppression of such acts, whether caused by or at the instigation or direction of any Insured or Insured's employees, patrons or any other person. Nor does this insurance apply to any claim, suit, cost or expense arising out of the alleged negligence or other wrong doing in the hiring, training, placement, supervision or monitoring of others by the insured."

¶ 12    The firearms exclusion stated: "This insurance does not apply to 'bodily injury' *** arising out of the existence, ownership, rental, maintenance, use, misuse or accidental discharge of firearms whether by any insured or insured employees, patron, tenant, guest or any other person,

regardless of individual, circumstances or location." The policy also contained a liquor liability exclusion endorsement, which, while referenced in the proceedings below, is not relevant on appeal.

¶ 13                            C. Procedural Background

¶ 14    In response to the underlying lawsuit, Markel sent Carolyn's a letter, dated November 21, 2013, which disclaimed coverage to Carolyn's for the incident described in the underlying complaint, explaining that the incident fell within the assault and battery exclusion, the firearms exclusion, and the liquor liability exclusion. The letter further stated that where there is no coverage, there is no duty to defend. In accordance with this letter, Markel did not defend Carolyn's in the lawsuit. On June 13, 2016, the circuit court entered a default judgment against Carolyn's, awarding $250,000 to Ms. Dangerfield and $2,788,087 to the estate of Mr. Matthews.

¶ 15    On October 4, 2017, Markel filed a complaint for declaratory judgment, seeking an order stating it did not owe a duty to defend or indemnify Carolyn's in the underlying action. Markel argued that the underlying incident was not an "occurrence" as defined by the policy and that coverage was excluded under the policy's assault and battery exclusion, firearms exclusion, and liquor liability exclusion.

¶ 16    Defendants filed a counterclaim along with their answer to the complaint and affirmative defenses on November 13, 2017. Their counterclaim alleged that Markel breached its duty to defend, breached its duty to indemnify, was estopped from asserting defenses to coverage for the default judgment, and its denial of coverage was vexatious and unreasonable under section 155 of the Illinois Insurance Code (Code) (215 ILCS 5/155 (West 2016)).

¶ 17    Markel filed for summary judgment on January 25, 2018, and defendants filed their response and cross-motion for summary judgment on March 1, 2018. The circuit court granted

defendants' motion for summary judgment and denied Markel's motion for summary judgment on June 27, 2018. In its order, the circuit court found that the underlying complaint asserted a claim that potentially fell within the policy's coverage and alleged facts that potentially fell outside the scope of the policy's exclusions. The court held that Markel breached its duty to defend and indemnify Carolyn's and that Markel's denial of the claim was vexatious and unreasonable under section 155 of the Code. The court also held that "Markel is estopped from asserting any defenses under the Policy and must satisfy the judgment entered against Carolyn's in the Underlying Action."

¶ 18     Markel filed a motion for modification of the order on July 27, 2018, arguing that the circuit court erred in stating that it was obligated to "satisfy the judgment" because the underlying judgment was for $3,038,087 and its indemnity obligation should not exceed the policy limit on insurance, which Markel argued was, in this case, $1 million. The circuit court granted Markel's motion on October 23, 2018, holding that the June 27 order should be modified to reflect that Markel "must satisfy the underlying judgment only to the extent of its policy limit." The court further ordered that "[i]f the parties disagree as to the applicable policy limit, they should so advise the court at the next status."

¶ 19     Defendants then moved to modify the circuit court's October 23 order and reinstate the June 27 order. The circuit court denied defendants' motion on April 2, 2019, and ordered the parties to submit briefs regarding Markel's policy limit. On May 6, 2019, the circuit court held that the policy's limit in this instance would be $1 million. This order was then withdrawn and replaced the following day to correct a scrivener's error.

¶ 20     On June 4, 2019, the circuit court entered a judgment for amounts due to defendants, listing $1 million owed under the policy, $64,931.45 in attorney fees and costs, and $268,273.97 in

interest. Defendants filed a notice of appeal the same day, specifically appealing (1) the October 23, 2018, order granting Markel's motion for modification of its indemnity obligation, (2) the April 2, 2019, order denying defendants' motion to modify the October 23, 2018, order, and (3) the May 6, 2019, order finding Markel's policy limit to be $1 million. Markel filed its notice of cross-appeal on June 19, 2019, appealing (1) the June 27, 2018, order granting defendants' motion for summary judgment and (2) the June 4, 2019, order requiring Markel to pay defendants $1,064,931.45 plus interest.

¶ 21    On August 12, 2019, Markel filed a motion to dismiss defendants' appeal on the basis that defendants' notice of appeal was deficient. This motion was taken with the case and will be denied for the reasons stated in this order.

¶ 22                             II. JURISDICTION

¶ 23    The circuit court entered its final judgment on June 4, 2019, and the defendants filed their timely notice of appeal the same day. Markel filed its timely notice of cross-appeal on June 19, 2019. This court has jurisdiction pursuant to Illinois Supreme Court Rules 301 (eff. Feb. 1, 1994) and 303 (eff. July 1, 2017), governing appeals from final judgments entered by the circuit court in civil cases.

¶ 24                              III. ANALYSIS

¶ 25    On appeal, defendants argue that the circuit court erred in determining that Markel's coverage liability for the underlying case was limited to its $1 million per occurrence policy limit or, alternatively, that the circuit court erred in determining that the underlying case involved only a single occurrence under the policy. Markel argues in its cross-appeal that (1) it had no duty to defend the underlying lawsuit because the claims were excluded from coverage, (2) it was not estopped from denying coverage for the default judgment, (3) its denial of coverage did not violate

section 155 of the Code, and (4) if this court determines it is estopped from denying indemnity, the $1 million per occurrence limit applies. We analyze Markel's motion to dismiss defendants' appeal first, followed by Markel's claims on appeal, which, for the reasons outlined below, resolve defendants' claims on appeal.

¶ 26                          A. Motion to Dismiss Defendants' Appeal

¶ 27    On August 12, 2019, after both parties filed their notices of appeal, Markel filed a motion before this court to dismiss defendants' appeal with prejudice, arguing defendants' notice of appeal did not confer appellate jurisdiction "because it appeal[ed] from non-appealable interlocutory orders." We find defendants' notice of appeal sufficient to survive dismissal.

¶ 28    "The filing of a notice of appeal 'is the jurisdictional step which initiates appellate review.' " *People v. Smith*, 228 Ill. 2d 95, 104 (2008) (quoting *Niccum v. Botti, Marinaccio, DeSalvo & Tameling, Ltd.*, 182 Ill. 2d 6, 7 (1998)). If there is no properly filed notice of appeal, then the reviewing court has no jurisdiction and should dismiss the appeal. *Id.*

¶ 29    Illinois Supreme Court Rule 303 (eff. July 1, 2017) governs appeals from final judgments in the circuit court. Illinois Supreme Court Rule 303(b)(2) (eff. July 1, 2017) requires that a notice of appeal "shall specify the judgment or part thereof or other orders appealed from and the relief sought from the reviewing court." Courts have routinely held that "a notice of appeal 'will confer jurisdiction on an appellate court if the notice, when considered as a whole, fairly and adequately sets out the judgment complained of and the relief sought so that the successful party is advised of the nature of the appeal.' " *In re Marriage of O'Brien*, 2011 IL 109039, ¶ 22 (quoting *Burtell v. First Charter Service Corp.*, 76 Ill. 2d 427, 433-34 (1979)). Therefore, "[w]here the deficiency in notice is one of form, rather than substance, and the appellee is not prejudiced, the failure to comply strictly with the form of notice is not fatal." (Internal quotation marks omitted.) *General Motors*

*Corp. v. Pappas*, 242 Ill. 2d 163, 176 (2011). We construe notices of appeal liberally. *Smith*, 228 Ill. 2d at 104.

¶ 30    Markel argues that the judgments defendants specified in their notice of appeal were not final judgments and therefore the notice of appeal did not comply with the supreme court rules. Defendants argue in response that their notice of appeal does satisfy the requirements of Rule 303(b)(2) and, in the alternative, that Markel's notice of a cross-appeal cures any jurisdictional defect.

¶ 31    In their notice of appeal, defendants listed the orders they wanted to appeal as the October 23, 2018, April 2, 2019, and May 6, 2019, circuit court orders. The October 23, 2018, order modified the June 27, 2018, order, which granted summary judgment to defendants and required Markel to indemnify defendants for the underlying judgment in its entirety. The October 23 order stated that Markel only needed to satisfy the underlying judgment *to the extent of its policy limit*. The April 2, 2019, order denied defendants' motion for modification of the October 23 order and reinstatement of the June 27 order. The May 6, 2019, order determined that the policy limit in this case was $1 million. While that order was replaced the next day to correct a minor error, the circuit court itself referred to the May 6 order instead of the May 7 order in its final judgment. Finally, the relief defendants requested on appeal was to "[r]einstate the Circuit Court's June 27, 2018[,] Order and Opinion granting summary judgment in favor of Appellants and against Appellee in its entirety; and vacate the subsequent Orders which reduced Appellee's financial obligation for the full underlying judgment amount."

¶ 32    While defendants' notice of appeal failed to specifically list the final order in the case—the June 4, 2019, order—it nonetheless undoubtedly "set[ ] out the judgment complained of and the relief sought so that the successful party is advised of the nature of the appeal." (Internal

quotation marks omitted.) *O'Brien*, 2011 IL 109039, ¶ 22. Defendants filed their notice of appeal directly after the final judgment in the case was delivered—clearly not intending to file an interlocutory appeal—and they specifically appealed the orders that comprised the June 4 judgment, except for the original order granting summary judgment in their favor, and requested that the court "vacate the subsequent Orders which reduced [Markel's] financial obligation for the full underlying judgment amount." Read broadly, this would include the June 4 order, which stated that "[Markel] shall pay $1,000,000.00 which was awarded to Defendants by the Court on May 6, 2019" and that Markel was to pay $64,931.45 in defendants' attorney fees and costs and $268,273.97 in interest. This was an error of form and not of substance, which in no way prejudiced Markel on appeal.

¶ 33    Markel cites numerous cases to support its position. However, each of those cases concern notices of appeal containing errors of substance that can be easily differentiated from defendants' notice of appeal in this case. In *General Motors Corp.*, 242 Ill. 2d at 176-78, for example, the court held that the notices of appeal in question "did not confer jurisdiction on the appellate court to review the trial court's award of judgment interest" where the final judgment "constituted *an entirely different matter* concerning the trial court's award of judgment interest at the rate of 6%" from the orders the party appealed from. (Emphasis added.) Likewise, in *Clark v. Gannett Co.*, 2018 IL App (1st) 172041, ¶¶ 55-58, the court found that a notice of appeal referencing an order that found "indirect criminal contempt" did not confer jurisdiction on the appellate court when that order was withdrawn for an order finding "direct criminal contempt." Finally, in *Corah v. The Bruss Co.*, 2017 IL App (1st) 161030, ¶¶ 20-21, the court held that a notice of appeal from an order granting summary judgment on a whistleblower claim did not confer jurisdiction over claims "involving emotional distress and punitive damages."

¶ 34    Here, defendants' notice of appeal listed orders that limited their coverage to $1 million. The final order of the case again listed $1 million as their recovery, in addition to attorney fees and interest. Unlike the appellees in the cases it cites, Markel was not prejudiced by the error in the notice of appeal—indeed Markel does not even make an argument that it was—because the orders defendants appealed from concerned the same issue as the final judgment and defendants' requested relief was for the court to vacate all orders that reduced Markel's coverage obligation. Markel was therefore aware of the judgment being appealed and not prejudiced by this error in form. Accordingly, we deny Markel's motion to dismiss defendants' appeal.

¶ 35                                    B. Duty to Defend

¶ 36    Markel argues in its cross-appeal that the circuit court erred when it determined that Markel had a duty to defend Carolyn's in the underlying lawsuit. We review the circuit court's grant of summary judgment *de novo. Williams v. Manchester*, 228 Ill. 2d 404, 417 (2008). "Summary judgment is appropriate only where the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Internal quotation marks omitted.) *Id.* "The construction of an insurance policy and a determination of the rights and obligations thereunder are questions of law for the court which are appropriate subjects for disposition by way of summary judgment." *Crum & Forster Managers Corp. v. Resolution Trust Corp.*, 156 Ill. 2d 384, 391 (1993).

¶ 37    When construing an insurance policy, the goal of the court is to give effect to the parties' intentions as expressed in the language of the agreement and, in doing so, analyze the policy as a whole. *Id.* If the insurance policy is unambiguous it will be applied as written and "only reasonable interpretations will be considered." *Hobbs v. Hartford Insurance Co. of the Midwest*, 214 Ill. 2d

11

11, 17 (2005). When the policy language is ambiguous, it will be construed liberally in favor of coverage. *Country Mutual Insurance Co. v. Livorsi Marine, Inc.*, 222 Ill. 2d 303, 311 (2006).

¶ 38    In determining whether an insurer has a duty to defend:

"the court must compare the allegations of the underlying complaint to the policy language. [Citations.] The allegations in the underlying complaint must be liberally construed in favor of the insured. [Citation.] If the court determines that these allegations fall within, or potentially within, the policy's coverage, the insurer has a duty to defend the insured against the underlying complaint." (Emphasis omitted.) *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 125 (1992).

¶ 39    The duty to defend is broader than the duty to indemnify. *Crum & Forster Managers Corp.*, 156 Ill. 2d at 398. To establish a duty to defend, the complaint needs only to present a possibility of recovery, not a probability, for coverage to potentially exist. *La Grange Memorial Hospital v. St. Paul Insurance Co.*, 317 Ill. App. 3d 863, 869 (2000). The question for this court, then, is whether the claims in the underlying lawsuit potentially fell within Markel's policy's coverage. Markel argues that its policy's "Assault and Battery Exclusion and Firearms Exclusion categorically exclude [Mr. Matthews and Ms. Dangerfield's] injuries from coverage." Defendants respond that Markel has failed to demonstrate that either exclusion covers all of the claims in the underlying complaint.

¶ 40    The underlying complaint in this action alleged that "[u]nknown employees/agents of [Carolyn's] locked or otherwise secured the front door of the premises, preventing [Mr.] Matthews[ ] and [Ms.] Dangerfield from re-entering the premises after being confronted by the armed [Mr.] Bettis and [Mr.] Jones" and that "[Mr.] Bettis and [Mr.] Jones assaulted and battered [Ms.] Dangerfield in the presence of security/bouncer, [Mr.] Lee." More specifically, the

complaint alleged that "[Mr.] Bettis, without any cause or provocation and with intent to do bodily harm to [Ms.] Dangerfield, did severely harm, assault, and batter [Ms.] Dangerfield by striking her in the face" and "without any cause or provocation and with intent to do bodily harm to [Mr.] Matthews, did severely harm, assault, and batter [Mr.] Matthews, by striking him in the face and body and fatally shooting him." The complaint further alleged, "[a]s a direct and proximate result of the intentional acts of [Mr.] Bettis, [Ms.] Dangerfield suffered severe and permanent physical and emotional injuries and [Mr.] Matthews, suffered and died from a fatal gunshot wound."

¶ 41    Under the assault and battery exclusion, Markel's policy specifically excluded "any claim, suit, cost or expense arising out of assault and/or battery, or out of any act or omission in connection with the prevention or suppression of such acts, whether caused by or at the instigation or direction of any Insured or Insured's employees, patrons or any other person."

¶ 42    The firearms exclusion in the policy stated:

"This insurance does not apply to 'bodily injury', 'property damage', 'personal injury', 'advertising injury' or medical payments arising out of the existence, ownership, rental, maintenance, use, misuse or accidental discharge of firearms whether by any insured or insured employees, patron, tenant, guest or any other person, regardless of individual, circumstances or location."

¶ 43    These endorsements to the policy are unambiguous in their exclusion of coverage for any claim arising out of an assault and battery, any claim arising out of any act or failure to act to prevent an assault or battery, or any claim arising out of the use or misuse of a firearm resulting in bodily injury, including accidental discharge. See, *e.g.*, *Hobbs*, 214 Ill. 2d at 20 (where there is only one reasonable interpretation of a provision, the provision is not ambiguous).

¶ 44    In *Britamco Underwriters, Inc. v. J.O.C. Enterprises, Inc.*, 252 Ill. App. 3d 96, 99-101

(1993), this court found that there was no possibility of coverage where the insurance policy in question excluded coverage for any action alleging damages from "1. Assault and Battery or any act or omission in connection with the prevention or suppression of such acts [or] 2. Harmful or offensive contact between or among two or more persons ***" and the action resulting in liability was an assault and battery of a patron, the defendant, at a pub. (Internal quotation marks omitted.) The underlying complaint in *Britamco* alleged that "[the pub] breached a duty to provide [the defendant] a safe environment by not ejecting the three patrons who attacked and beat him." *Id.* at 100. The court first determined that the section excluding assault and battery from coverage was unambiguous in that, according to the language, the insurer "[was] not obligated to defend [the pub] in an action arising out of an incident in the nature of assault or battery." *Id.* The court then looked at the definition of "civil battery" in Illinois case law, which it defined as "the wil[l]ful touching of the person of another or a successful attempt to commit violence on the person of another." (Internal quotation marks omitted.) *Id.* at 101. The court reasoned:

> "In his complaint [the defendant] alleges that the three patrons 'physically attacked [him,] hitting him with their hands and kicking him with their feet on various parts of the body including the head' and that [the defendant] 'was seriously injured.' Thus, the facts alleged in [the compliant] constitute[d] harmful or offensive contact, as stated in the endorsement, and civil battery as defined by Illinois law." *Id.*

¶ 45    The court further determined that the actions alleged met the definition for criminal battery and noted that one of the patrons was convicted of aggravated battery for his actions in the incident. *Id.* The court held that "the underlying incident, by all accounts in the nature of a battery, is not within the indemnity coverage of the policy, and therefore, [the insurance company] is not obliged to defend the action or indemnify the insured." *Id.*

¶ 46    Here, the complaint alleged that Mr. Bettis, "with intent to do bodily harm," attacked both Mr. Matthews—"by striking him in the face and body and fatally shooting him"—and Ms. Dangerfield—"by striking her in the face." Mr. Matthews was murdered, and Ms. Dangerfield was seriously injured. The policy did not define "assault" or "battery," so we must afford them their ordinary meaning. See *Valley Forge Insurance Co. v. Swiderski Electronics, Inc.*, 223 Ill. 2d 352, 366 (2006). Assault is defined as:

> "[t]he threat or use of force on another that causes that person to have a reasonable apprehension of imminent harmful or offensive contact; the act of putting another person in reasonable fear or apprehension of an immediate battery by means of an act amounting to an attempt or threat to commit a battery." Black's Law Dictionary (11th ed. 2019).

Battery is defined as "[t]he nonconsensual touching of, or use of force against, the body of another with the intent to cause harmful or offensive contact." Black's Law Dictionary (11th ed. 2019). The allegations of underlying complaint, that Mr. Bettis intentionally hit both Ms. Dangerfield and Mr. Matthews and intentionally shot Mr. Matthews, are allegations of battery that fall under the policy's exclusion.

¶ 47    Defendants attempt to distinguish *Britamco* by citing the fact that one of the individuals who committed the assault and battery was tried and found guilty of aggravated battery and by arguing that the exclusion in *Britamco* was broader than the exclusion the present policy. However, as Markel correctly points out, these arguments are inconsequential. While the policy in *Britamco* did explicitly list "[h]armful or offensive contact between or among two or more persons," (internal quotation marks omitted) (*Britamco*, 252 Ill. App. 3d at 99) and the exclusion in this case did not, the court in *Britamco* specifically decided the case under the assault and battery language (*id.* at 101). And while one of the batterers was convicted of aggravated battery, the law directs

15

courts to look only to the allegations of the underlying complaint and the language of the policy to determine whether there is coverage. *Outboard Marine Corp.*, 154 Ill. 2d at 125. Whether or not Mr. Bettis was ever tried and found guilty of battery is immaterial.

¶ 48 Defendants cite *L.A. Connection v. Penn-America Insurance Co.*, 363 Ill. App. 3d 259 (2006), to support their argument that the policy exclusions, despite their clear language to the contrary, do not bar coverage here. The underlying complaint in *L.A. Connection* alleged that an armed individual entered the "plaintiff's premises on November 11, 2001, armed with a handgun and thereafter shot and killed [a patron]." *Id.* at 261. The complaint further alleged that the plaintiff was negligent for allowing the armed individual to enter, for not providing security, and for failing to search the armed individual for a weapon. *Id.* The defendant-insurer argued that it had no duty to defend because its policy "contained an exclusion for injury or damages 'resulting from assault and battery or physical altercations that occur in, on, near, or away from' the insured premises, including damages arising out of the insured's failure to properly supervise or keep the premises in a safe condition." *Id.* at 263. The plaintiff argued that this exclusion did not "necessarily apply because the complaint [did] not allege an *intentional* shooting and could describe an *accidental* discharge of the firearm." (Emphases in original.) *Id.* The court agreed with the plaintiff, reasoning that, when construing the complaint liberally in favor of the plaintiff, "the allegations of the complaint are not, on their face, *clearly* encompassed by the assault and battery exclusion and therefore are *potentially* within the policy's coverage."(Emphases in original.) *Id.*

¶ 49 The complaint and exclusion in *L.A. Connection*, however, differ from the underlying complaint and exclusion in this case. The court noted in *L.A. Connection* that the underlying complaint did not allege "an *intentional* shooting and could describe the *accidental* discharge of the firearm." (Emphases in original.) *Id.* The underlying complaint in this case, however, alleged

an "intentional" battery. It specifically alleged that Mr. Bettis acted "with intent to do bodily harm" to both Mr. Matthews and Ms. Dangerfield. In reference to Ms. Dangerfield, it also specifically alleged that Mr. Bettis "did severely harm, assault, and batter [Ms.] Dangerfield by striking her in the face." Further, the complaint alleged that Mr. Matthews was "assault[ed] and batter[ed]" by Mr. Bettis and Mr. Jones. In addition, in this case, in contrast to *L.A. Connection*, the firearms exclusion was also operable, and it explicitly limited coverage for even accidental discharges of firearms. Even if the assault and battery exclusion did not apply to Mr. Matthews's injuries, which it clearly does, the firearms exclusion would bar coverage.

¶ 50    Finally, defendants argue that the underlying complaint "allege[d] negligent conduct on the part of Carolyn's that does not relate to, or arise out of, any potential assault or battery." Defendants specifically point this court to the allegations that "Carolyn's security guards allowed Mr. Bettis and Mr. Jones to enter the premises in an 'obviously intoxicated state'; allowed them to consume their own bottles of alcohol; and never called the police once they were asked to leave the premises." Markel responds that these "negligent acts and omissions were alleged to have caused the attack that injured Ms. Dangerfield and killed Mr. Matthews" and that, "[t]herefore, the alleged negligence is inseparable from the assault and battery and the use of a firearm, and there is no coverage under the Policy regardless of how the causes of action were pleaded." We agree.

¶ 51    Every allegation in the underlying complaint clearly arises out of the assault and battery of Ms. Dangerfield and Mr. Matthews and the use of the firearm to kill Mr. Matthews. The "allegations" listed by defendants as not arising out of the assault and battery or the shooting, *e.g.*, Carolyn's negligently allowing Mr. Bettis and Mr. Jones to consume alcohol on the premises, are allegations that Carolyn's breached its duty of care. However, to state their claim for negligence, the underlying plaintiffs also had to allege the other three elements of negligence: duty, causation,

17

and damages. *Enadeghe v. Dahms*, 2017 IL App (1st) 162170, ¶ 14. The complaint clearly stated that "[a]s a direct and proximate result of one of the aforesaid acts or omissions, or a combination thereof, [Ms.] Dangerfield suffered severe and permanent physical and emotional injuries and [Mr.] Matthews[ ] was shot and killed." Put another way, Carolyn's actions in permitting Mr. Bettis and Mr. Jones to drink on the premise caused the assault and battery and the use of the firearm to shoot Mr. Matthews. There would be no negligence claim without the assault, battery, and shooting, and these endorsements specifically excluded coverage for "any claim" "arising out of" the use of a firearm or an assault and battery.

¶ 52    Defendants argue that, since Markel made no effort to defend Carolyn's in the underlying lawsuit, it is estopped from denying coverage. This argument however rests on a misunderstanding of estoppel in the insurance context.

¶ 53    Under Illinois law, when an insurer disputes its duty to provide a defense in an underlying lawsuit, it must either (1) defend the suit under a reservation of rights or (2) seek a declaratory judgment that there is no coverage. *Employers Insurance of Wausau v. Ehlco Liquidating Trust*, 186 Ill. 2d 127, 150 (1999). If the insurer fails to do either and is later found to have wrongfully denied coverage, it will be estopped from raising policy defenses to coverage. *Id.* at 150-51. The estoppel doctrine only applies, however, "where an insurer has breached its duty to defend." *Id.* at 151. Estoppel does not apply "if the insurer had no duty to defend, or if the insurer's duty to defend was not properly triggered." *Id.* In other words, while estoppel may bar the insurer from relying on policy defenses like an insured's late notice of the claim, it cannot create coverage where no coverage would otherwise exist. *Id.*

¶ 54    In short, due to the clear and unambiguous language in the exclusions, Markel had no duty to defend because the allegations do not even potentially fall within the policy's coverage.

¶ 55                                C. Defendants' Appeal

¶ 56    Our finding that there was no duty to defend moots or resolves all the issues in defendants'

appeal. We need not concern ourselves with policy limits or the number of occurrences this

incident represents, since there was no possibility of coverage.

¶ 57    Section 155 of the Code permits the award of attorney fees and costs if the insurer's actions

are "vexatious and unreasonable." 215 ILCS 5/155 (West 2016). Because we find that the policy

did not provide coverage for the underlying lawsuit, Markel's failure to defend was not vexatious

and unreasonable under section 155. See *O'Rourke v. Access Health, Inc.*, 282 Ill. App. 3d 394,

406 (1996) ("a legitimate policy defense, supported by appropriate authority, cannot be considered

vexatious and unreasonable").

¶ 58                                IV. CONCLUSION

¶ 59    For the reasons stated above, we reverse the circuit court's decision granting summary

judgment to the defendants and denying Markel's motion for summary judgment.

¶ 60    Reversed.

---

**No. 1-19-1175**

---

| | |
|---|---|
| **Cite as:** | *Markel International Insurance Company Limited v. Montgomery*, 2020 IL App (1st) 191175 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 2017 CH 13342, the Hon. Pamela McLean Meyerson, presiding. |

---

**Attorneys**

---

| | |
|---|---|
| **for Appellants/Cross-Appellees:** | Eric J. Emerson and Joe Welch, of Emerson & Elder, P.C., of Chicago, for appellants/cross-appellees. |
| **Attorneys for Appellee/Cross-Appellant:** | Matthew S. Sorem and Emily R. Steinberg, of Nicolaides Fink Thrope Michaelides Sullivan LLP, of Chicago, for appellee/cross-appellant. |